GROSS v. GEORGE W. SCOTT MANUF'G CO. et al.

(Circuit Court, N. D. Georgia. January 3, 1894.)

EQUITY—RESCISSION OF SALE OF LANDS—DOUBLE AGENCY.

The mere fact of a double agency in the sale of land gives the vendor no right of rescission, when he had full knowledge that the agent was acting for the purchaser, and of all other facts, including the nature and value of the land, which were known either to the agent or the purchaser, and were necessary to intelligent action, especially when the price was the full market price of like lands at the time.

In Equity. Suit by Charles H. Gross against the George W. Scott Manufacturing Company and the De Soto Land & Phosphate Company to rescind a sale of lands. A demurrer to the bill was heretofore overruled. 48 Fed. 35. The cause is now heard on the pleadings and evidence. Bill dismissed.

Bisbee & Rinehart, for complainant.

Candler & Thompson, for defendants.

NEWMAN, District Judge. In this case, which is on the equity side of the court, there was a demurrer to the bill, and an opinion of the court overruling the demurrer. Gross v. Manufacturing Co., 48 Fed. 35. There has now been a final hearing in the case on the bill, answer, and evidence. The complainant in this suit seeks to rescind a contract of sale of certain lands in Florida, made in the year 1889. The right of complainant to have a rescission of this

sale is based by counsel for complainant on two grounds:   First, that there was a double agency on the part of John Cross, through whom the transaction was made; and, secondly, that even if this double agency did not exist, or is ineffectual for the purpose stated, there were misrepresentations on the part of Cross, acting as agent of defendants, which were made to complainant, as to the nonexistence of phosphate in or on the land, by reason of which complainant was induced to part with the land for much less than its real value.   John Cross was a real-estate agent in the state of Florida, and doing an extensive business.   He represented a large number of nonresidents who owned land in that state.   He was the agent for complainant, Charles H. Gross.   As to some of the lands of complainant, not embracing those involved in this suit, Cross was authorized to sell at a price agreed upon between himself and his principal without consultation with his principal.   As to the land now in controversy, Cross was the agent of Gross to look after it, pay the taxes, keep off trespassers, etc., but had no authority to sell without first submitting the offer to Gross.

George W. Scott was the president of the George W. Scott Manufacturing Company, and of the De Soto Land & Phosphate Company. The same individuals, substantially, were the officers and members of both companies.   In August, 1889, when negotiations for the purchase of this land by Scott were commenced, Scott had already purchased a considerable amount of lands on Peace river, in Florida, near where the land afterwards purchased from Gross was located. On the 7th of August, 1889, George W. Scott, in writing, requested John Cross to purchase for him several different tracts of land in this locality, to wit, a portion of section 30, township 35 S., of range 25 E., and section 10, township 33 S., of range 25 E.   Gross refused to sell a portion of the tracts mentioned unless he could sell all, and finally, upon telegraphic authority from Scott, Cross purchased from Gross all of the two sections mentioned except the S. $\frac{1}{2}$ of S. E. $\frac{1}{4}$, and N. W. $\frac{1}{4}$ of N. W. $\frac{1}{4}$, which was not owned by Gross.   It seems that, at the time Scott requested Cross to buy, neither Scott nor Cross knew that Gross owned the land in question, and that a few days afterwards, by investigation of records, Cross ascertained that the sections which Scott desired were owned by Gross, and that he thereupon communicated that fact to Scott.   This fact of Cross' ignorance of Gross' ownership of this particular land at the time of Scott's instructions to him, which must be taken as clearly established by the evidence, seems, at first glance, inconsistent with the fact of his agency for Gross in reference to his lands; but this is easily explained, for the reason that Cross seems to have been largely engaged in this business of acting as agent for nonresidents, and the land was simply given to him by the section and township numbers, by which he would not recognize them as Gross' land until the records called this fact to his attention.

Other parties in Boston, Mass., and Philadelphia, Pa., owned lands which were embraced in the list which Scott had requested Cross to purchase.   Gross himself was a resident of Philadelphia.   After Cross ascertained the ownership of the various tracts of land which

Scott desired to purchase, he informed Scott that he thought it would be better if he (Cross) could go north, and see the parties who owned the lands, in reference to their sale. This was acquiesced in by Scott, who, at Cross' request, advanced some money to pay the expenses of the trip. Cross then went to Philadelphia, and saw Gross about the sale of the land. Cross had been instructed by Scott not to pay more than $2.50 per acre, and Gross refused to sell unless he could sell the entire sections, of which Scott only desired to purchase a part. Cross telegraphed Scott to this effect, and received, in reply, authority from Scott to. purchase the entire sections. Gross then agreed to sell, and two days later deeds to the land were executed and delivered by Gross to John Cross; Scott having deposited the money to make the payment for the purchase to Cross' credit, with which money the purchase money was paid. During the conversation between Gross and Cross in reference to the sale of the land, Gross testifies that he asked Cross "if there was phosphate on the land." To this inquiry Cross replied, "No." The other witnesses to the transaction, including Cross, testify that, in reply to the question named, Cross replied "that the land was not being purchased for that purpose, but for the purpose of controlling the river front."

The bill alleges that Cross stated to Gross that the George W. Scott Manufacturing Company desired to buy the land in question. While there is some difference in the evidence about this, it is conceded by counsel for complainant that this must be taken as established, namely, that Gross knew that Cross was buying the land for the Scott Manufacturing Company. The De Soto Land & Phosphate Company, of which George W. Scott was the president, was engaged in mining phosphate on Peace river, a few miles from the land sold by Gross, prior to and at the time of this transaction. Scott's company—either the De Soto Company or the Scott Manufacturing Company—owned lands both above and below that sold by Gross, on Peace river, and the acquisition by Scott of the land in question, for one or the other of his companies, seems to have been an entirely natural thing, independently of the question of phosphate on the land.

The evidence further shows that Peace river is winding and full of sharp bends, that along the bed of this river and its banks the deposits of phosphate shift and change with the rise and fall of the river, and that the location of one of these deposits one year is no evidence that it will be found there another or succeeding years. As pertinent at this point, a reference may be made to certain interrogatories propounded by complainant in the bill to defendants, and the answers thereto. Interrogatory 11 is as follows:

"Whether or not, prior to October 7, 1889, the defendants, or either of them, owned in whole or in part, or had contracted to purchase, any lands on Peace river near or in the vicinity of the lands described in the bill of complaint as having been conveyed to John Cross by complainant, and, if so. what quantity of such lands did defendants, or either of them, own or had contracted to purchase prior to said date; and state how near any of said lands were located to the lands conveyed to John Cross by complainant, and whether or not any of such lands which defendants, or either of them,

owned or had contracted to purchase prior to the date aforesaid, to the knowledge of the defendants, or either of them, prior to said date, had on or in them phosphates or phosphates of lime."

The answer of the defendants to the above interrogatory, so far as material here, is as follows:

"They, [defendants,] nor either of them, had any knowledge of what sort of phosphatic material the land contained, but simply had a theory or belief that most of the lands along said river contained phosphatic material or gravel in greater or less quantities, and that the same was being washed out of the land into the bed of said river, where bars and deposits of the gravel were formed in basins at the bends of the river, and which bars and deposits contained all of such material defendants knew or know to exist in or on said lands, in quantities that it would pay to work."

In answering interrogatory 12, which is practically the same as interrogatory 11, defendants repeat the greater part of their answer to interrogatory 11, and state, in addition, that they considered the lands as being valuable to them, outside of the existence of phosphate, for the purpose of controlling the river; that they do not now know what said lands are worth, but considered that, at the time they were purchased, $2.50 per acre was all they were worth, and would not have paid any more; that, for two years prior to the purchase of the lands by the Scott Manufacturing Company, its president, George W. Scott, had been making examinations of the bed of said river, and had not deemed lands of complainant valuable for phosphatic material, and therefore did not purchase them. Afterwards, when he discovered how deposits were made in the bed of the river, he decided that, whether or not said lands contained phosphate in paying quantities, they would be worth $2.50 per acre to his companies, to enable them to control the river.

Cross testifies that at the time of the sale by Gross he did not know of any phosphate on the land in question, and that at the same time, he sold land of his own in the same locality at the same price. Cross, some months after the sale, in response to an inquiry from Gross as to why he did not tell him that there was phosphate on the land, replied that he did not know it, and that he sold land of his own at the same price; and this reply of Cross to Gross is urged as an argument that there was phosphate on the land. Now, this question as to whether or not there was phosphate in paying quantities on the land in question is left somewhat in doubt by the evidence. There is one witness who testifies to having made experiments on the land with a view of determining this matter, and he found, according to his evidence, considerable deposits of phosphate. It is quite clearly shown, however, that no phosphate has been taken from any part of this land; and whether there is such an amount of deposit as to make it profitable to work it, is really undetermined.

So that these propositions may be considered as established by the evidence: First, that the defendants did not know, and that Cross did not know, at the time of this transaction, whether there was phosphate on the land or not; second, that Cross made no intentional misrepresentation of the facts, even assuming that he answered Gross categorically, as Gross stated he did, to wit, that there was no phosphate on the land, and assuming that he did not answer,

as the preponderance of the testimony is, that the land was not being purchased for phosphate purposes, but for other purposes; and, third, that Gross knew that the land was being bought for Scott, and that the general purpose for which Scott was engaged in buying lands in Florida was to mine phosphate. It cannot be held, therefore, taking the propositions contended for by the complainant in inverse order, that there were such misrepresentations of facts by Cross to Gross, acted on by Gross, as to justify a court of equity in rescinding the contract of sale for that reason. There is no proof to show that Scott had ever made any special investigation of this particular land, or had any special knowledge concerning it, so far as relates to the existence of phosphate. Gross knew, therefore, just as much as Cross knew, or as Scott knew. He had the whole situation in his mind, and, with all these lights before him, seems to have acted, as he expressed it himself, "because his pocketbook told him to do so."

If the evidence showed, as the bill alleged, that Scott knew of the existence of phosphate on the land, and induced Cross for a consideration, knowing him to be Gross' agent, to falsely represent to Gross that there was no phosphate on the land, a very different case would be presented, and one which, as was held by the court in overruling the demurrer, would justify the interposition of a court of equity. Such, as has been stated, is not the case here, however. Scott did not know, at the time he employed Cross, that he was Gross' agent, and, so far as the evidence shows, subsequently made no effort whatever to influence him to disregard any obligations that he may have been under to Gross; and Cross, so far as the evidence shows, did not knowingly wrong Gross in any way, because it is undisputed that he sold land of his own in the same locality at the same price, and at the same time.

The other proposition which is insisted upon in this case is that the double agency which it is said existed vitiates the contract, and justifies and requires its rescission. The doctrine relied upon is that one being the agent of a person to sell cannot at the same time act as the agent of another person to buy, and that, upon the admission or proof of this inconsistent employment, the court will presume the contract injurious, and consequently fraudulent. Conceding this rule to exist in all the strictness contended for by counsel for complainant, a contrary or reverse proposition must also be conceded, namely, that if the principal, being the seller under such circumstances, has all the knowledge that the agent possesses—has all the facts before him that the agent has—which would lead to intelligent action in the premises, including the fact that the agent was also acting for the purchaser in the transaction, the seller could not afterwards set up the fact of double agency as a ground for voiding the contract. While silence on the part of the agent, and ignorance on his principal's part of the agent's opposing interests in a transaction, would justify the law's interposition, yet a full communication of the facts on the part of the agent, and complete knowledge of the facts on the principal's part, would just as certainly lay no foundation for judicial interference with a transaction to

which it applied.    In this case Cross stated to Gross that he wanted to buy the land for Scott; and while the deed was made, in the first instance, to Cross, it is clearly shown to have been with the knowledge of the fact on Gross' part that the conveyance was made thus simply for convenience in the transaction, and that Scott, for himself or one of his companies, was the real purchaser.    The matter of the existence or nonexistence of phosphate on the land, and the conversation between Cross and Gross in reference thereto, has already been discussed and disposed of.    There is much force in the contention made here that if Cross, prior to the time the sale was consummated, was the agent of Gross in any way connected with the sale of the land, he was his agent to do exactly what he did in this case, namely, to find somebody who wanted to buy, and bring the offer to Gross.    The only compensation which it is claimed that Cross received from Scott as to this particular land was the money advanced to pay Cross' expenses on his trip north. This trip was made, it appears, for the purpose of buying various other tracts of land besides those bought from Gross, and it seems that the amount advanced was simply the amount of Cross' expenses on the trip.    After the sale was consummated, Gross paid Cross' commission of 10 per cent. on the amount of the purchase money.    To this extent Gross certainly recognized Cross' services to him in finding a purchaser for the land, and paid him for it; but the sale, it is entirely clear, he made himself, and on his own judgment.    Cross' relation to this transaction as an intermediary in bringing about the sale is clearly shown, but the matter of agency to either of the principals is more obscure when the facts are analyzed.

On the whole, the conclusion must be that no such concealed double agency existed as to justify the rescission of the contract on that ground.

Besides all this, the preponderance of the evidence shows that this land, when sold, brought what was at that time a fair market price.    It was several months after the sale before any investigation was made as to the existence of phosphate on this land, and while, as has been stated, it is uncertain under the evidence whether phosphate exists in paying quantities or not, even conceding that such is the case, it was not known to any one at the time of the sale, and large tracts—in fact, vast tracts—of land seem to have been sold about the same time, (a little before and after the time of this transaction,) and for no greater price.    Conceding, therefore, what must be admitted from this evidence,—that no one connected with the transaction knew at the time whether this land was particularly valuable or not, and that the purchaser and seller both took their chances on the existence or nonexistence of phosphate thereon, —the price paid was all that the land was fairly worth, according to the evidence, in the market at the time.    From this evidence it clearly appears that large portions of the land bought by Scott and his companies were valueless except from the fact that it was connected with other land which was valuable.    Phosphate seems to have been found here and there along this river, constantly

changing its location, and a person buying land there without careful investigation, which certainly had not been made in this case before the sale, took the chances on what he purchased, and paid accordingly. The fact that Cross himself, a real-estate dealer, living and doing business in the vicinity, trading largely in these lands, accepted the same price for his own land, (which is not disputed,) ought to be conclusive that it was as much as the land was fairly worth in the market at the time.

For the reasons which have been given, no sufficient ground exists for granting a decree to rescind this contract as prayed for, and there must be a decree dismissing the bill, with costs.